UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X   Case No.
CANDACE BUTTS,

                              Plaintiff

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION,
JUSTINE BRETAGNA, JON MESSINGER, CONNIE
HAMILTON, UNITED FEDERATION OF TEACHERS,
and MICHAEL SOLO,

                              Defendants
------------------------------------------------------------------- X   **COMPLAINT**

Plaintiff, CANDACE BUTTS, by her attorneys, LAW OFFICES OF K.C. OKOLI, P.C., complaining of the defendants, alleges as follows:

JURISDICTION AND VENUE

1. This is an action for money damages and injunction. This action arises under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1983, Labor Management Relations Act ("LMRA"), §301 et seq., First Amendment to the United States Constitution, and New York City Human Rights Law ("NYCHRL") §8-107 et seq.

2. Venue is proper in this district based upon the fact that the events or omissions which gave rise to the claims asserted herein occurred within the Eastern District of New York.

1

3. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 and 1343.

4. This Court has supplemental jurisdiction over the causes of action asserted in this action under the local laws of the State of New York.

5. At all times relevant to this action, the individual defendants were acting under color of law as employees of the New York City Department of Education.

PARTIES

6. Plaintiff, CANDACE BUTTS ("BUTTS"), is an employee of defendant, NEW YORK CITY DEPARTMENT OF EDUCATION ("DOE").

7. BUTTS is an African American female who was born in the United States of America.

8. At all times relevant to this action, BUTTS was employed as a Paraprofessional at John Dewey High School, located at 50 Avenue X, Brooklyn, New York 11223 ("JDHS").

9. BUTTS was assigned to work with a Special Education student at JDHS whose Individualised Educational Plan ("IEP") required a one-to-one supervision by a Paraprofessional.

10. DOE is a department of the City of New York, organized and existing under and by virtue of the laws of the State of New York. DOE has offices within the Eastern District of New York.

11. At all times relevant to this action, DOE was responsible for, had control of, and managed JDHS.

12. At all times relevant to this action, defendant JUSTINE BRETAGNA ("BRETAGNA") was the Assistant Principal for Special Education at JDHS. BRETAGNA is a White female.

13. At all times relevant to this action, defendant Jon Messinger ("MESSINGER") was the Assistant Principal for Organization at JDHS. MESSINGER is a White male.

14. At all times relevant to this action, defendant Connie Hamilton ("HAMILTON") was the Principal of JDHS. HAMILTON is a White female.

15. At all times hereinafter mentioned, BRETAGNA was acting under color of law in her capacity as an Assistant Principal at JDHS, and in the course and within the scope of her employment and authority as an Assistant Principal.

16. At all times hereinafter mentioned MESSINGER was acting under color of law in his capacity as an Assistant Principal at JDHS, and in the course and within the scope of his employment and authority as an Assistant Principal.

17. At all times hereinafter mentioned HAMILTON was acting under color of law in her capacity as the Principal of JDHS, and in the course and within the scope of her employment and authority as the Principal.

18. United Federation of Teachers ("UFT") is the labor union to which BUTTS belongs. UFT is invested with exclusive power to represent BUTTS in employment-related contractual disputes with DOE.

19. Michael Solo ("SOLO") was the Union Representative from UFT who was assigned to handle BUTTS' employment-related contractual disputes and grievances with her employer, DOE and its agents. SOLO is a White male.

RELEVANT FACTS

20. BUTTS has been employed continuously by DOE since 2001, without any serious incidents or disciplinary problems, until after the beginning of this year, 2016.

21. At the start of the school year in September 2015, BRETAGNA held a meeting with the paraprofessionals at JDHS at which she told the paraprofessionals about a new policy she said was instituted by Carmen Farina with regard to special education students assigned to work one-to-one with paraprofessionals.

22. At the aforesaid meeting, BRETAGNA indicated that some paraprofessionals would be "excessed" and paraprofessionals assigned to special education students one-to-one would be reassigned as classroom paraprofessionals.

23. Subsequent to this meeting, there were several discussions between BUTTS and Nadia, another paraprofessional, at which Ashley, another paraprofessional, was present.

24. BUTTS openly expressed her views that, without first changing the IEP, BRETAGNA's expressed new policy would contravene the IEP of the special education students whose IEP required one-to-one paraprofessional supervision, and would violate their educational and civil rights.

25. Unlike Nadia, Ashley listened to the conversations but did not participate or express any views.

26. About the time of the aforesaid conversations, Ashley was observed on multiple occasions going into BRETAGNA's office and having conversations with BRETAGNA.

27. Upon information and belief, Ashley had some association with BRETAGNA at another school where BRETAGNA was an administrator.

28. Upon information and belief, Ashley shared with BRETAGNA the fact that BUTTS had expressed very strong views on the propriety of the idea of removing one-to-one paraprofessionals from students whose IEP provided for such supervision.

29. In addition to sharing her views at the meeting of September 2015 on what would happen to the one-to-one paraprofessionals at JDHS, it was no secret that BRETAGNA wanted to eliminate many paraprofessionals from JDHS which was largely populated by African American students, or cut down on the benefits of the one-to-one special education students at JDHS.

30. On or about October 14, 2015, BRETAGNA circulated a memorandum in which she asked paraprofessionals to stop by Room 117 because they now had a weekly attendance sheet which must be completed on a daily basis.

31. In response to this memorandum, BUTTS asked whether BRETAGNA asked social workers, speech therapists and other related workers to submit their SESIS since paraprofessionals had to hand in their SESIS each month. SESIS is the record of students' attendance.

32. Apparently this question by BUTTS did not sit well with BRETAGNA. The very next day, October 15, 2015, BRETAGNA wrote BUTTS inviting her to a disciplinary meeting with her union representative on October 19, 2015.

33. As of January 2016, Ashley was the person next in line among paraprofessionals to be excessed. Instead, with the help of BRETAGNA, Ashely was promoted to another position which was not openly advertised or interviewed for. Ashley is a White female.

34. Meanwhile, other paraprofessionals, overwhelmingly minorities, who would have retained their position had Ashley been excessed were excessed by BRETAGNA.

35. Although BUTTS was not one of those who were excessed, BUTTS openly shared her view that the manner in which BRETAGNA handled Ashley's promotion and the excessing of the largely minority paraprofessionals was unfair.

36. On or about February 2, 2016, BRETAGNA removed BUTTS from her student 4 period class, thus denying the special education African American male student assigned to BUTTS, RM, the benefit of BUTTS' assistance for the ICT class.

37. When BUTTS informed BRETAGNA that she was a one-to-one paraprofessional, and that RM was entitled to one-to-one assistance for his class, BRETAGNA retorted that she could put BUTTS anywhere regardless of BUTTS' title.

38. BUTTS reported her removal to DOE on its hotline, which was acknowledged on February 3, 2016.

39. BUTTS was in fact removed from assisting RM for about one week during which time RM did not in fact have any one-to-one paraprofessional assigned to assist him.

40. The aforesaid conduct on the part of BRETAGNA was a violation of the civil rights of RM and BUTTS made it clear to BRETAGNA that BRETAGNA had violated RM's rights and the terms of RM's IEP.

41. On February 3, 2016, while BUTTS was in the Teachers' lunchroom during her assigned lunch break, a White Female School Aide, Barbara Cali, left her post in the Students' lunchroom and came into the Teachers' lunchroom to go through her, Ms. Cali's locker.

42. While going through her locker, Ms. Cali looked towards BUTTS and said in a raised voice, "You're a dumb bitch to write your name on your locker if you could fucking read" and quickly exited the Teachers' lunchroom. BUTTS, in fact, had her name written on her locker.

43. Shortly thereafter, it was time for BUTTS to go to the Students' lunch room to accompany her IEP student to his next period class. When BUTTS approached Ms. Cali to ask her about the statement she made to her a little while ago in the Teachers' lunch room, Ms. Cali began to scream at BUTTS.

44. As a result of the aforesaid, a verbal confrontation ensued between both women in which they raised their voices above normal conversation levels. However, there was no physical contact between BUTTS and Ms. Cali.

45. The next day, being February 4, 2016, BRETAGNA wrote BUTTS inviting BUTTS to a disciplinary meeting with her union representative with regard to the Cali-BUTTS incident on February 9, 2016.

46. BUTTS promptly reported to DOE that she was being harassed by BRETAGNA who had recently begun nit-picking BUTTS' work and was looking for any reason to get rid of BUTTS as a paraprofessional at JDHS.

47. On March 18, 2016, BRETAGNA again issued BUTTS with a written invitation to attend a disciplinary meeting with her union representative on March 22, 2016.

48. On or about April 13, 2016, unbeknownst to BUTTS, BRETAGNA attended a Broadway Show with others and RM without a one-to-one paraprofessional.

49. It does not appear that BRETAGNA gave any or sufficient thought to the safety implications for RM when BRETAGNA undertook a trip to a Broadway Show with RM without an assigned one-to-one paraprofessional.

50. On May 19, 2016, BRETAGNA gave BUTTS a letter of discipline backdated to May 9, 2016, with regard to the incident of February 3, 2016.

51. On or about May 23, 2016, BUTTS requested SOLO to file a grievance on her behalf with regard to this disciplinary letter dated May 9, 2016. Upon information and belief, SOLO did not file the grievance requested by BUTTS.

52. On May 17, 2016, BRETAGNA gave BUTTS a letter of discipline backdated to May 11, 2016, arising out of the disciplinary meeting of March 22, 2016.

53. On or about May 23, 2016, BUTTS requested SOLO to file a grievance on her behalf with regard to this disciplinary letter dated May 11, 2016. Upon information and belief, SOLO did not file said grievance.

54. By a letter dated June 10, 2016, BRETAGNA informed BUTTS that the incident of February 3, 2016, between her and Ms. Cali had been substantiated against BUTTS; and that BUTTS had violated Chancellor's Regulation A-421 – a regulation that does not apply to incidents between staff members.

55. BRETAGNA further informed BUTTS that BUTTS would be suspended without pay, as a result, from September 6, 2016 through September 14, 2016. This letter of June 10, 2016 was unsigned.

56. On June 14, 2016, HAMILTON issued BUTTS a letter inviting BUTTS and her union representative to a disciplinary meeting on June 15, 2016 which was dubbed "a due consideration meeting."

57. On June 27, 2016, BRETAGNA reissued essentially her earlier letter dated June 10, 2016, except that the suspension without pay would run from September 7, 2016 through September 14, 2016. This letter was also not signed.

58. On or about September 16, 2016, BUTTS received a letter from DOE advising her that her City health coverage ended on 9/6/2016.

59. Upon further inquiry, BUTTS learned that it was HAMILTON who advised that BUTTS' health coverage be terminated as aforesaid.

60. On September 30, 2016, BUTTS received a letter from Emblem Health dated 9/26/2016, advising that BUTTS no longer had any health coverage effective 9/8/2016.

61. The aforesaid letters mean that payment for any doctor's visits or hospital visits which BUTTS undertook from September 6, 2016, will be BUTTS' personal responsibility.

## AS AND FOR A FIRST CAUSE OF ACTION
## FOR FIRST AMENDMENT VIOLATION

62. Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "61" as if specifically set forth herein.

63. When BUTTS expressed her views on the intention of BRETAGNA to remove one-to-one paraprofessionals from IEP students for whom it had been prescribed, BUTTS was speaking on a matter of public interest.

64. BUTTS was entitled to speak on such a matter because it affected the rights and welfare of special education students who needed said one-to-one supervision as per their IEP.

65. By the defendants subjecting BUTTS to adverse employment actions following her expression of her opinion on the impropriety of denying African American special education students the rights granted them by their IEP, they have improperly retaliated against BUTTS.

66. Even to this day, BRETAGNA is still violating the rights of the new special education student, KG, who is assigned to BUTTS on a one-to-one supervision.

67. By reason of the foregoing, plaintiff has suffered loss and damage.

## AS AND FOR A SECOND CAUSE OF ACTION
## FOR RACE DISCRIMINATION

68. Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "67" as if specifically set forth herein.

69. By excessing minority paraprofessionals who would have retained their jobs if Ashley had not been promoted and remained a paraprofessional who was next in line to be excessed, BRETAGNA showed her racial bias against non-White paraprofessionals

70. By her conduct of having Ashley promoted to a position without giving other similarly-situated minority paraprofessionals, including BUTTS, the opportunity to compete for the promotional position, BRETAGNA discriminated against BUTTS on the basis of her race as an African American.

71. By reason of the foregoing, plaintiff has suffered loss and damage.

## AS AND FOR A THIRD CAUSE OF ACTION FOR RETALIATION

72. Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "71" as if specifically set forth herein.

73. By filing multiple complaints with the DOE, whether through the 311 system of OEO, BUTTS was engaging in protected activity.

74. The response of the defendants which include multiple discipline letters and meetings, suspension without pay, and ultimately cancellation of BUTTS health insurance benefits, is all retaliation against BUTTS for engaging in protected activity.

75. By reason of the foregoing, Plaintiff has suffered loss and damage.

## AS AND FOR A FOURTH CAUSE OF ACTION
## AGAINST UFT AND SOLO FOR BREACH
## OF THEIR DUTY OF FAIR REPRESENTATION

76. Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "75" as if specifically set forth herein.

77. The CBA requires UFT to engage in an earnest effort with DOE to timely resolve BUTTS' Grievance which UFT failed to do by itself and by SOLO.

78. Moreover, SOLO completely failed to even attempt to obtain relevant factual information from BUTTS to help in the timely and successful resolution of BUTTS' suspension without pay.

79. The aforesaid failures constitute arbitrary and bad faith conduct on the part of SOLO and UFT.

80. By its conduct herein, UFT and SOLO have breached their duty of fair representation to BUTTS.

81. By reason of the foregoing, Plaintiff has suffered loss and damage.

82. Plaintiff demands a jury trial of all issues triable by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following reliefs against the defendants:

a) On the First Cause of Action, compensatory damages in the sum ONE MILLION DOLLARS ($1,000,000.00);

b) On the Second Cause of Action, compensatory damages in the sum of ONE MILLION DOLLARS ($1,000,000.00);

    c)    On the Third Cause of Action, compensatory damages in the sum of ONE MILLION DOLLARS ($1,000,000.00);

    d)    On the Fourth Cause of Action, compensatory damages in the sum of ONE MILLION DOLLARS ($1,000,000.00);

    e)    Punitive damages against BRETAGNA;

    f)    Permanent injunction to restrain the defendants by themselves, their servants and/or agents from discriminating or retaliating against BUTTS;

    g)    Reasonable Attorneys' fees;

    h)    Costs and disbursements of this action;

    i)    Such further or other relief as to the court may see fit, just and equitable in the circumstances.

Dated:    New York, New York
            October 3, 2016

                        **LAW OFFICES OF K.C. OKOLI, P.C.**
                        Attorneys for Plaintiff
                        CANDACE BUTTS
                        330 Seventh Avenue
                        15th Floor
                        New York, New York 10001
                        (212) 564-8152

                        By: _____/s/_____
                            K.C. OKOLI, ESQ.