UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X           Case No. 16-CV-05504
CANDACE BUTTS,                                                                                  (NGG-RML)

Plaintiff

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION,
JUSTINE BRETAGNA, JON MESSINGER, CONNIE
HAMILTON, and MICHAEL SOLO,

Defendants
------------------------------------------------------------------- X           **AMENDED COMPLAINT**

Plaintiff, CANDACE BUTTS, by her attorneys, LAW OFFICES OF K.C. OKOLI,

P.C., complaining of the defendants, alleges as follows:

JURISDICTION AND VENUE

1. This is an action for money damages and injunction. This action arises under 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1983, First Amendment to the United States Constitution, and New York City Human Rights Law ("NYCHRL"), §8-107 et seq.

2. Venue is proper in this district based upon the fact that the events or omissions which gave rise to the claims asserted herein occurred within the Eastern District of New York.

3. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 and 1343.

4. This Court has supplemental jurisdiction over the causes of action asserted in this action under the local laws of the State of New York.

5. At all times relevant to this action, the individual defendants named herein were acting under color of law as employees of the New York City Department of Education.

## PARTIES

6. Plaintiff, CANDACE BUTTS ("BUTTS"), is an employee of defendant, NEW YORK CITY DEPARTMENT OF EDUCATION ("DOE").

7. BUTTS is an African American female who was born in the United States of America.

8. At all times relevant to this action, BUTTS was employed as a Paraprofessional at John Dewey High School, located at 50 Avenue X, Brooklyn, New York 11223 ("JDHS").

9. In or about September 2015, BUTTS was assigned to work with a Special Education student at JDHS whose Individualised Educational Plan ("IEP") required a one-to-one supervision by a Paraprofessional.

10. DOE is a department of the City of New York, organized and existing under and by virtue of the laws of the State of New York. DOE has offices within the Eastern District of New York.

11. At all times relevant to this action, DOE was responsible for, had control of, and managed JDHS.

12. At all times relevant to this action, defendant JUSTINE BRETAGNA ("BRETAGNA") was the Assistant Principal for Special Education at JDHS. BRETAGNA is a White female.

13. At all times relevant to this action, defendant Jon Messinger ("MESSINGER") was the Assistant Principal for Organization and was also in charge of budget matters at JDHS. MESSINGER is a White male.

14. At all times relevant to this action, defendant Connie Hamilton ("HAMILTON") was the Principal of JDHS. HAMILTON is a White female.

15. At all times hereinafter mentioned, BRETAGNA was acting under color of law in her capacity as an Assistant Principal at JDHS, and in the course and within the scope of her employment and authority as an Assistant Principal.

16. At all times hereinafter mentioned, MESSINGER was acting under color of law in his capacity as an Assistant Principal at JDHS, and in the course and within the scope of his employment and authority as an Assistant Principal.

17. At all times hereinafter mentioned, HAMILTON was acting under color of law in her capacity as the Principal of JDHS, and in the course and within the scope of her employment and authority as the Principal.

18. Michael Solo ("SOLO") was the Union Representative from UFT who was assigned to handle BUTTS' employment-related contractual disputes and grievances with her employer, DOE and its agents. SOLO is a White male.

## RELEVANT FACTS

19. BUTTS has been employed continuously by DOE since 2001, without any serious incidents or disciplinary problems, until the beginning of the 2015/2016 school year.

20. At the start of the 2015/2016 school year in September 2015, BRETAGNA held a meeting with the Paraprofessionals at JDHS at which she informed the Paraprofessionals about a new policy she said was instituted by Carmen Farina, the Schools Chancellor. BRETAGNA represented that this new policy relates to special education students assigned to work one-to-one with Paraprofessionals.

21. At the aforesaid meeting, BRETAGNA indicated that some Paraprofessionals would be "excessed" and Paraprofessionals assigned to special education students one-to-one would be reassigned as classroom Paraprofessionals.

22. At no time were the Paraprofessionals, including BUTTS, provided a copy of this new policy, nor has BUTTS seen a copy of same.

23. Subsequent to the aforesaid September meeting, there were several discussions between BUTTS and Lynette, a Paraprofessional Union representative, at which Ashley, another Paraprofessional, was present.

24. BUTTS openly expressed her views that, without first changing the students' IEP, BRETAGNA's expressed new policy would contravene the IEP of the special education students whose IEP required one-to-one Paraprofessional supervision. BUTTS further stated that such a move would violate the educational and civil rights of such special education students.

25. Unlike Lynette, Ashley listened to the conversations but did not participate or express any views.

26. Ashley is a White female while, upon information and belief, Lynette is a Hispanic female.

27. About the time of the aforesaid conversations, Ashley was observed on multiple occasions going into BRETAGNA's office and having conversations with BRETAGNA.

28. Upon information and belief, Ashley had some prior association with BRETAGNA at another school where BRETAGNA was an administrator.

29. Upon information and belief, Ashley shared with BRETAGNA, the fact that BUTTS had expressed very strong views on the propriety of removing one-to-one Paraprofessionals from special education students whose IEP provided for one-to-one supervision.

30. In addition to BRETAGNA informing Paraprofessionals at the meeting of September 2015 about what would happen to the one-to-one Paraprofessionals employed at JDHS, it was no secret that BRETAGNA wanted to eliminate many Paraprofessionals from JDHS, or cut down on the benefits of the African American one-to-one special education students.

31. Also in September 2015, at a faculty meeting at JDHS, HAMILTON had stated that she wanted to return JDHS to what it was. BUTTS understood this statement to mean that HAMILTON wanted JDHS to be a predominantly White school as it was in the 90s and before.

32. JDHS is currently populated largely populated by African American and other minority students.

33. On or about October 14, 2015, BRETAGNA circulated a memorandum in which she asked Paraprofessionals, including BUTTS, to stop by Room 117 because they now had a weekly attendance sheet which must be completed on a daily basis. The memorandum indicated that the system would allow for the tracking of students' attendance.

34. BRETAGNA also informed BUTTS and other paraprofessionals that, in addition to moving their time cards to indicate the day and time of their attendance, Paraprofessionals were to report and check in at BRETAGNA's office every day the came to work.

35. Following this memorandum, BUTTS and BRETAGNA had a meeting at which BUTTS asked BRETAGNA whether she asked social workers, speech therapists and other related workers to submit their SESIS since Paraprofessionals had to submit their SESIS each month. SESIS is the record of students' attendance.

36. Apparently, BUTTS' question did not sit well with BRETAGNA who, on the very next day, October 15, 2015, wrote BUTTS inviting her to a disciplinary meeting with her union representative on October 19, 2015.

37. On the day of the aforesaid disciplinary meeting, SOLO informed BUTTS that he had met earlier with BRETAGNA and that the disciplinary meeting would no longer hold.

38. SOLO further informed BUTTS that BRETAGNA was upset at the tone of BUTTS' question but that BUTTS did not have to sign in at the beginning of BUTTS' work day.

39. As of January 2016, Ashley was the person next in line among Paraprofessionals to be excessed. Instead of being excessed, BRETAGNA helped Ashley gain promotion to Community Coordinator position which ensured that Ashley was not excessed.

40. The Community Coordinator position to which Ashley was promoted was not advertised by DOE or at JDHS to give equal employment opportunity to other interested qualified minority Paraprofessionals at JDHS.

41. Meanwhile, other Paraprofessionals, overwhelmingly minorities, who would have retained their positions had Ashley been excessed were excessed by BRETAGNA. Some of the minority paraprofessionals who were excessed were Ms. Kuma and Mr. Singh.

42. While BRETAGNA was busy excessing minority paraprofessionals from JDHS, one White male and one White female paraprofessionals were hired in January/February 2017, to provide paraprofessional services at JDHS.

43. Although BUTTS was not one of those who were excessed or in danger of being excessed by reason of Ashley being promoted to Community Coordinator with increased income, BUTTS openly expressed her views that the manner in which BRETAGNA handled Ashley's promotion and the excessing of the largely minority Paraprofessionals was unfair and appeared discriminatory.

44. On or about February 2, 2016, BRETAGNA removed BUTTS from her student 4 period class, thus denying RM, the special education Bangladeshi, Brown male student assigned to BUTTS, the benefit of BUTTS' assistance for the ICT class.

45. When BUTTS reminded BRETAGNA that RM was entitled to one-to-one assistance for his class, and that BUTTS was a one-to-one Paraprofessional, BRETAGNA retorted that she could put BUTTS anywhere, regardless of BUTTS' title.

46. BUTTS was in fact removed from assisting RM for about one week during which time RM did not in fact have any one-to-one Paraprofessional assigned to assist him.

47. BUTTS reported her removal as RM's one-to-one Paraprofessional to DOE on DOE's hotline, which was acknowledged on February 3, 2016.

48. The aforesaid conduct on the part of BRETAGNA was a violation of the civil rights of RM, and BUTTS made it clear to BRETAGNA, that BRETAGNA had violated RM's rights and the terms of RM's IEP.

49. On February 3, 2016, while BUTTS was in the Teachers' lunchroom during her assigned lunch break, a White Female School Aide, Barbara Cali, left her post in the Students' lunchroom and came into the Teachers' lunchroom to go through her, Ms. Cali's locker.

50. While going through her locker, Ms. Cali looked towards BUTTS and said to BUTTS in a raised voice, "You're a dumb bitch to write your name on your locker if you could fucking read" and quickly exited the Teachers' lunchroom. BUTTS, in fact, had written her name on her locker in the lunchroom.

51. Shortly thereafter, it was time for BUTTS to go to the Students' lunch room to accompany her IEP student to his next period class. When BUTTS approached Ms. Cali in the Students' lunch room to ask her about the statement she made to her a little while ago in the Teachers' lunch room, Ms. Cali began to scream at BUTTS.

52. As a result of the aforesaid, a verbal confrontation ensued between BUTTS and Ms. Cali in which they raised their voices above normal conversation levels. However, there was no physical contact between BUTTS and Ms. Cali.

53. Later that same day, BUTTS was invited to the School Principal's Office where she met with BRETAGNA and another Assistant Principal, Bobbie; they questioned BUTTS about the incident with Ms. Cali. Ms. Cali was not present at this meeting.

54. When BRETAGNA and AP Bobbie asked BUTTS to sign a statement regarding her encounter with Ms. Cali, BUTTS interpreted that as a disciplinary action and informed BRETAGNA and AP Bobbie that she would not sign any statement without first consulting with SOLO or any other union representative.

55. BRETAGNA and AP Bobbie tried to pressure BUTTS into signing the statement, telling her that SOLO would be informed of the meeting and what transpired. BUTTS still declined to sign without the presence of her union representative.

56. The next day, being February 4, 2016, BRETAGNA wrote BUTTS inviting BUTTS to a disciplinary meeting with her union representative on February 9, 2016, but without indicating the subject of disciplinary meeting.

57. At the February 9, 2016 meeting, it turned out that the subject of the meeting was the incident of February 3, 2016 between BUTTS and Ms. Cali. Ms. Cali was not present at this February 9, 2016 meeting.

58. Upon information and belief, BRETAGNA never had a similar disciplinary meeting with Ms. Cali regarding the encounter between Ms. Cali and BUTTS.

59. At the meeting of February 9, 2016, for strategic reasons, SOLO asked BUTTS to apologise to BRETAGNA which BUTTS did.

60. Prior to February 3, 2016, BUTTS did not have any conflicts or negative interaction with Ms. Cali and, upon information and belief, BRETAGNA was using Ms. Cali as one of her means of aggravating BUTTS and creating an abusive work environment for BUTTS.

61. BRETAGNA began to severely scrutinize BUTTS and her work more than she did BUTTS' non-African American, non-minority co-workers; BRETAGNA was nit-picking BUTTS' work and looking for ways to get rid of BUTTS as a Paraprofessional at JDHS.

62. BUTTS promptly reported to DOE on February 3 and 4, 2016 that BRETAGNA was harassing her by, among other things, placing negative letters in her mailbox and calling her in frequently for disciplinary meetings.

63. On or about March 11, 2016, BRETAGNA told BUTTS that BUTTS would go to a Professional Development on March 15, 2016 to which no other Paraprofessional was sent.

64. On March 15, 2016, BUTTS had no one to take charge of or supervise BUTTS' one-to-one student. As a result, BUTTS did not attend the Professional Development.

65. On March 18, 2016, BRETAGNA again issued BUTTS with a written invitation to attend a disciplinary meeting with her union representative on March 22, 2016. This disciplinary meeting was about the failure to attend the aforesaid Professional Development.

66. On March 22, 2016, BUTTS attended a disciplinary meeting at which BRETAGNA and SOLO were present. At the meeting, BRETAGNA wanted to know why BUTTS did not attend the Professional Development and BUTTS explained that no arrangement was made for anyone to supervise her one-to-one student and she could not leave the student without supervision.

67. BRETAGNA proceeded to lecture BUTTS on her role and job duties as a paraprofessional. The only thing which SOLO said at the meeting was that BUTTS will attend the Professional Development next time.

68. On or about April 13, 2016, unbeknownst to BUTTS, BRETAGNA attended a Broadway Show with others and RM without a one-to-one Paraprofessional.

69. It does not appear that BRETAGNA gave sufficient thought to the safety implications for RM when BRETAGNA undertook a trip to a Broadway Show with RM without his assigned one-to-one Paraprofessional.

70. Upon information and belief, BRETAGNA was doing two things when she took RM to a Broadway show without his assigned one-to-one Paraprofessional:

unwittingly endangering the welfare of RM and trying to portray BUTTS one-to-one paraprofessional duty as needless and redundant at JDHS.

71. On May 17, 2016, BRETAGNA gave BUTTS a letter of discipline backdated to May 9, 2016, with regard to the incident of February 3, 2016 with Ms. Cali, in which BRETAGNA concluded that the case against BUTTS had been substantiated.

72. The aforesaid letter also stated that BUTTS had violated Chancellor's Regulation A-421 – a regulation which does not apply to incidents between staff members like Ms. Cali and BUTTS.

73. On or about May 23, 2016, BUTTS requested SOLO to file a grievance on her behalf with regard to this backdated disciplinary letter of May 9, 2016. Upon information and belief, SOLO did not file the grievance requested by BUTTS.

74. On or about June 13, 2016, BUTTS filed a formal letter of rebuttal to the backdated letter of May 9, 2016.

75. On May 17, 2016, BRETAGNA gave BUTTS another letter of discipline backdated to May 11, 2016, arising out of the disciplinary meeting of March 22, 2016. The letter contained many factual errors.

76. On or about May 23, 2016, BUTTS requested SOLO to file a grievance on her behalf with regard to this backdated disciplinary letter of May 11, 2016. Upon information and belief, SOLO did not file said grievance.

77. On June 14, 2016, HAMILTON issued BUTTS a letter inviting BUTTS and her union representative to a disciplinary meeting on June 15, 2016 which was dubbed "a due consideration meeting."

78. On June 27, 2016, BRETAGNA reissued essentially her earlier letter dated May 9, 2016, except that this latter letter, unlike the earlier one, imposed punishment on BUTTS which included suspension without pay effective September 7, 2016 through September 14, 2016.

79. On or about September 6, 2016, BRETAGNA gave BUTTS yet another letter backdated to June 10, 2016, which is a version of the letter dated June 27, 2016. In this letter the effective dates of suspension were changed to September 6, 2016 through September 14, 2016.

80. As a matter of practice, DOE will not dock an employee's pay as was done in BUTTS' case unless BUTTS signed off on it or there is an administrative hearing at which such was recommended based upon supporting findings of fact.

81. Despite BUTTS' suspension without pay, BUTTS was in fact paid since she was ready, willing and able to work.

82. did not sign any document or agree with anyone that any part of her pay be withheld

83. Upon information and belief, MESSINGER, as the Assistant Principal in charge of budget matters at JDHS, falsely advised Payroll and Human Resources that BUTTS had agreed to a loss of pay as a way to resolve a disciplinary matter.

84. Without the aforesaid false information, BUTTS' pay for the period September 6, 2016 through September 14, 2016, would not have been withheld by DOE.

85. On or about September 16, 2016, BUTTS received a letter from DOE advising her that her City health coverage ended on 9/6/2016.

86. Upon further inquiry, BUTTS learned that it was HAMILTON who advised that BUTTS' health coverage be terminated as aforesaid.

87. On or about September 29, 2016, BUTTS went to the Union head office and requested that a grievance be filed on her behalf with regard to her suspension without pay and letters of May 11 and June 27, 2016.

88. On September 30, 2016, BUTTS received a letter from Emblem Health dated 9/26/2016, advising that BUTTS no longer had any health coverage effective 9/8/2016.

89. The aforesaid letters mean that payment for any doctor's visits or hospital visits which BUTTS undertook from September 6, 2016, will be BUTTS' personal responsibility.

90. BUTTS has in fact personally paid for medical treatment received by her during this period when her health coverage was suspended and/or terminated.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>
<u>FOR FIRST AMENDMENT VIOLATION</u>

91. Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "90" as if specifically set forth herein.

92. When BUTTS expressed her views on the intention of BRETAGNA to remove one-to-one paraprofessionals from IEP students for whom it had been prescribed, BUTTS was speaking on a matter of public interest.

93. BUTTS was entitled to speak on such a matter because it affected the rights and welfare of special education students who needed said one-to-one supervision as per their IEP.

94. Moreover, BUTTS was advocating for the rights of the IEP student who was under her supervision.

95. By the defendants subjecting BUTTS to adverse employment actions following her expression of her opinion on the impropriety of denying African American special education students the rights granted them by their IEP, defendants have retaliated against BUTTS.

96. Even to this day, BRETAGNA is still violating the rights of the new special education student, KG, who is assigned to BUTTS on a one-to-one supervision.

97. By reason of the foregoing, plaintiff has suffered loss and damage.

## AS AND FOR A SECOND CAUSE OF ACTION
## FOR RACE DISCRIMINATION

98. Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "97" as if specifically set forth herein.

99. By excessing minority paraprofessionals who would have retained their jobs if Ashley had not been promoted and remained a paraprofessional who was next in line to be excessed, BRETAGNA showed her racial bias against non-White paraprofessionals.

100. While or shortly after excessing minority paraprofessionals from JDHS, in early 2017 defendants hired two White paraprofessionals at JDHS: one male and a one female.

101. By their conduct of having Ashley promoted to a Community Coordinator position while denying other similarly-situated minority paraprofessionals, including BUTTS, the opportunity to compete for the promotional position,

defendants discriminated against BUTTS on the basis of her race as an African American.

102. By reason of the foregoing, plaintiff has suffered loss and damage.

AS AND FOR A THIRD CAUSE OF ACTION FOR RETALIATION

103. Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "102" as if specifically set forth herein.

104. By openly protesting the manner in which BRETAGNA handled the excessing of minority paraprofessionals because of their race, BUTTS was protesting race discrimination in the work place. BUTTS therefore engaged in protected activity.

105. Following this engagement in protected activity, defendants retaliated against BUTTS in various ways including, removing BUTTS from her one-to-one supervision of an IEP special education student, supervising her with greater scrutiny, suspending her without pay, suspending her health coverage and benefits.

AS AND FOR A FOURTH CAUSE OF ACTION FOR RETALIATION

106. Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "105" as if specifically set forth herein.

107. By filing multiple complaints with the DOE, whether through the 311 system or OEO, BUTTS was engaging in protected activity.

108. The response of the defendants which include multiple discipline letters and meetings, suspension without pay, and ultimately cancellation of BUTTS health

insurance benefits, are all retaliation against BUTTS for engaging in protected activity.

109. By reason of the foregoing, Plaintiff has suffered loss and damage.

**AS AND FOR A FIFTH CAUSE OF ACTION AGAINST
SOLO FOR AIDING AND ABETTING
RACE DISCRIMINATION AND RETALIATION**

110. Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "109" as if specifically set forth herein.

111. The CBA requires UFT to engage in an earnest effort with DOE to timely resolve BUTTS' Grievance.

112. SOLO was the UFT representative who was initially charged with the responsibility to held BUTTS resolve her issues with DOE, but failed to take any steps.

113. Moreover, SOLO completely failed to even attempt to obtain relevant factual information from BUTTS to help in the timely and successful resolution of BUTTS' suspension without pay.

114. SOLO was fully aware of the position which BUTTS had taken, both on the issue of IEP for special education students and the handling of the excessing of minority paraprofessionals at JDHS.

115. SOLO knew that there was a racial component to the manner in which BRETAGNA and other defendants were treating BUTTS issues.

116. By his failure and/or refusal to act, SOLO was aiding and abetting defendants in their racial discrimination and retaliation against BUTTS.

117. By reason of the foregoing, Plaintiff has suffered loss and damage.

### AS AND FOR A SIXTH CAUSE OF ACTION AGAINST MESSINGER FOR AIDING AND ABETTING RACE DISCRIMINATION AND RETALIATION

118. Plaintiff repeats and realleges each and every allegation of paragraphs "1" through "117" as if specifically set forth herein.

119. By falsely advising Payroll and Human Resources that BUTTS had agreed to accept the withholding of her pay for the period September 6, 2016 through September 14, 2014, MESSINGER was aiding and abetting the race discrimination and retaliation against BUTTS.

120. By reason of the foregoing, plaintiff has suffered loss and damage.

121. Plaintiff demands a jury trial of all issues triable by jury.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following reliefs against the defendants:

a) On the First Cause of Action, compensatory damages in the sum ONE MILLION DOLLARS ($1,000,000.00);

b) On the Second Cause of Action, compensatory damages in the sum of ONE MILLION DOLLARS ($1,000,000.00);

c) On the Third Cause of Action, compensatory damages in the sum of ONE MILLION DOLLARS ($1,000,000.00);

d) On the Fourth Cause of Action, compensatory damages in the sum of ONE MILLION DOLLARS ($1,000,000.00);

e) On the Fifth Cause of Action, compensatory damages in the sum of ONE MILLION DOLLARS ($1,000,000.00);

f) On the Sixth Cause of Action, compensatory damages in the sum of ONE MILLION DOLLARS ($1,000,000.00);

g) Punitive damages against BRETAGNA and HAMILTON;

h) Permanent injunction to restrain the defendants by themselves, their servants and/or agents from discriminating or retaliating against BUTTS;

i) Reasonable Attorneys' fees;

j) Costs and disbursements of this action;

k) Such further or other relief as to the court may see fit, just and equitable in the circumstances.

Dated: New York, New York
March 27, 2017

**LAW OFFICES OF K.C. OKOLI, P.C**.
Attorneys for Plaintiff
CANDACE BUTTS
330 Seventh Avenue
15th Floor
New York, New York 10001
(212) 564-8152

By: _____/s/_____
K.C. OKOLI, ESQ.

**FOR SERVICE ON:**

Matthew J. Connahan
Assistant Corporation Counsel
NYC Law Department
100 Church Street
New York, New York 10007
*Attorney for NYC Department of Education,*
*Justine Bretagna, Jon Messinger and*
*Connie Hamilton*

Lori M. Smith, Esq.
Gregory M. Ainsley, Esq.
New York State United Teachers
50 Broadway, 9th floor
New York New York 10004
*Attorneys for UFT and Michael Solo*