UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

CANDACE BUTTS,

                Plaintiff,

      -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION, JUSTINE BRETAGNA, JON
MESSINGER, CONNIE HAMILTON, and
MICHAEL SOLO,

                Defendants.
------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**16-CV-5504 (NGG) (RML)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Candace Butts brings this action against Defendants the New York City

Department of Education (the "DOE"), Justine Bretagna, Jon Messinger, Connie Hamilton

(collectively, the "Municipal Defendants"), and Michael Solo. (See Am. Compl. (Dkt. 21).)

Against the Municipal Defendants, Plaintiff asserts causes of action for a First Amendment

violation, race discrimination, and retaliation under 42 U.S.C. §§ 1981 and 1983 and the New

York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq. Against

Messinger and Solo, Plaintiff asserts causes of action for aiding and abetting race discrimination

and retaliation.

      Before the court are Solo's and the Municipal Defendants' motions to dismiss the claims

against them (Solo Mot. to Dismiss ("Solo MTD") (Dkt. 29); Mun. Defs. Mot. to Dismiss

("Mun. Defs. MTD") (Dkt. 37).)[1] For the following reasons, Solo's motion is GRANTED and

the Municipal Defendants' motion is GRANTED IN PART and DENIED IN PART.

---

[1] The Municipal Defendants' motion is brought under Federal Rule of Civil Procedure 12(b)(6). (Mun. Defs. MTD
at 1.) Solo's motion is brought under Rule 12(b)(1), (5), and (6). (Solo MTD at 1.)

# I. BACKGROUND

## A. Factual Allegations

The court takes the following statement of facts largely from the amended complaint, the well-pleaded allegations of which the court generally accepts as true for the purposes of Defendants' motions to dismiss. See N.Y. Pet Welfare Ass'n v. City of New York, 850 F.3d 79, 86 (2d Cir. 2017).

Plaintiff, an African-American female, is employed by the DOE as a paraprofessional. (Am. Compl. ¶¶ 6-10.) The DOE assigned Plaintiff to John Dewey High School ("JDHS") in Brooklyn, New York, a DOE-managed school that is primarily populated by African-American and other minority students. (Id. ¶¶ 8, 11, 32.) At JDHS, Plaintiff was assigned to work with a special education student whose Individualized Education Plan ("IEP")[2] required 1:1 supervision. (Id. ¶ 9.) Bretagna, a Caucasian female, and Messinger, a Caucasian male, are both assistant principals at JDHS. (Id. ¶¶ 12-13.) Hamilton, a Caucasian female, is the principal at JDHS. (Id. ¶ 14.) Solo is a Caucasian male, a member of the United Federation of Teachers ("UFT"), and Plaintiff's union representative. (Id. ¶ 18.)

From 2001 until the beginning of the 2015-2016 school year, Plaintiff was employed by the DOE without incident. (Id. ¶ 19.) At a September 2015 meeting, Bretagna informed all JDHS paraprofessionals about a new JDHS policy (the "policy") that would "excess" (i.e., relocate) some paraprofessionals from JDHS and reassign others who had been working 1:1 with students to a classroom setting, where they would supervise many students at a time. (Id. ¶¶ 20-21.) After that meeting, Plaintiff and "Lynette," a paraprofessional union representative, had

---

[2] An IEP is a written summary of the educational program designed to meet a disabled student's individual needs. See 20 U.S.C. § 1414(d).

several discussions in which Plaintiff expressed her belief that the policy would violate the educational and civil rights of students whose IEPs required 1:1 paraprofessional supervision. (Id. ¶¶ 23-24.) Another paraprofessional, a Caucasian woman identified as "Ashley," was present during these conversations but did not participate or express any views. (Id. ¶¶ 23, 26). Around this time, Ashley—who had "some prior association with Bretagna at another school"—was observed visiting Bretagna's office on multiple occasions, and allegedly told Bretagna about Plaintiff's comments regarding the new policy. (Id. ¶¶ 23, 26-29.) Allegedly, "it was no secret" that Bretagna wanted to eliminate many paraprofessionals from JDHS and reduce the benefits provided to African-American special education students whose IEPs required 1:1 supervision. (Id. ¶ 30.)

Also in September 2015, Hamilton announced at a JDHS faculty meeting that she "wanted to return JDHS to what it was." (Id. ¶ 31.) Plaintiff understood this to mean that Hamilton wanted JDHS to be predominantly Caucasian, as it had been in the 1990s and before then. (Id.)

In October 2015, Bretagna instituted two new policies, one of which required all paraprofessionals to check in at Bretagna's office at the start of every day. (Id. ¶¶ 33-34.) On October 14, 2015, Plaintiff questioned Bretagna about these new policies and then, the next day, Bretagna invited her to a disciplinary meeting with Solo (her union representative) that was to take place three days later. (Id. ¶¶ 35-36.) On the day of the planned meeting, however, Solo informed Plaintiff that the meeting was canceled, and that he had already spoken with Bretagna, who was upset at the tone of Butts's question about the new policies but had decided that Butts would not have to check in each morning. (Id. ¶¶ 37-38.)

In January 2016, Bretagna allegedly helped Ashley—who was next in line to be excessed—gain promotion to a Community Coordinator position, which ensured that Ashley would not be excessed. (Id. ¶ 39.) This position was never advertised, so minority paraprofessionals were unaware of it. (Id. ¶ 40.) Consequently, other paraprofessionals, most of whom were minorities, were excessed in lieu of Ashley. (Id. ¶ 41.) Plaintiff was not excessed or in danger of being excessed, but openly expressed her view that Ashley's promotion and the excessing of many minority paraprofessionals was unfair and appeared discriminatory. (Id. ¶ 43.) About a year later, in early 2017, JDHS hired two new Caucasian paraprofessionals, despite the fact that Bretagna was continuing to excess minority paraprofessionals. (Id. ¶ 42.)

On February 2, 2016, over Plaintiff's objections, Bretagna removed Plaintiff from her 1:1 assignment with a special education student identified as "RM."[3] (Id. ¶¶ 44-45.) Plaintiff "made it clear to Bretagna[] that Bretagna had violated RM's rights and the terms of RM's IEP." (Id. ¶ 48.) The next day, Plaintiff reported to a DOE hotline that she had been removed as RM's 1:1 paraprofessional. (Id. ¶ 47.) Plaintiff may have filed other complaints with the DOE as well. (See id. ¶ 107.)

Also on February 3, 2016, Barbara Cali, a Caucasian school aide with whom Plaintiff had not previously had any conflict, said to Plaintiff without being prompted, "You're a dumb bitch to write your name on your locker if you could fucking read." (Id. ¶ 49-50.) Shortly thereafter, Plaintiff approached Cali to ask her about her statement, and Cali started screaming at Plaintiff. (Id. ¶ 51.) A verbal confrontation ensued between the two of them. (Id. ¶ 52.) Plaintiff, upon

---

[3] In their briefing regarding the motions to dismiss, the parties dispute whether Plaintiff was temporarily or permanently reassigned. (See Pl. Opp'n to Mun. Defs. Mot (Dkt. 40) at 2.) The amended complaint is unclear on this point. (See Am. Compl. ¶ 46.)

information and belief, alleges that Bretagna enlisted Cali to create an abusive work environment for Plaintiff. (Id. ¶¶ 60-61.)

Later that day, Plaintiff was invited to the school principal's office, where she met with Bretagna and Bobbie, another assistant principal. (Id. ¶ 53.) Bretagna and Bobbie questioned Plaintiff about her confrontation with Cali and asked her to sign a statement regarding the incident. (Id.) Plaintiff interpreted this request as a disciplinary action, and refused to sign the statement without first consulting a union representative. (Id. ¶ 54)

On February 9, 2016, Bretagna held another disciplinary meeting with Butts. (Id. ¶¶ 56-57.) This time, Solo was present. (Id. ¶ 59.) At this meeting, at Solo's request, Plaintiff apologized to Bretagna about the incident with Cali. (Id. ¶¶ 56-57, 59.) This began a pattern of Bretagna scrutinizing Plaintiff's work more than the work of her Caucasian co-workers. (Id. ¶ 60). Bretagna never invited Cali to any similar disciplinary meetings. (Id. ¶ 58.)

In March 2016, Bretagna told Plaintiff to attend a professional-development course that no other paraprofessionals were asked to attend. (Id. ¶ 63.) Plaintiff ultimately did not attend the course because she could not find anyone else to supervise her student, whose IEP required 1:1 supervision. (Id. ¶ 64.) Bretagna then invited Plaintiff and Solo to another disciplinary meeting on March 22, 2016, regarding Plaintiff's failure to attend the course. (Id. ¶ 66.) At the meeting, Plaintiff explained why she could not attend the course and Bretagna replied by lecturing Plaintiff about her responsibilities as a paraprofessional. (Id. ¶ 67.) Solo said only that Plaintiff would attend the next professional-development course. (Id.)

In April 2016, unbeknownst to Plaintiff, Bretagna attended a Broadway Show with several people, including RM (for whom Plaintiff was the assigned 1:1 paraprofessional). (Id. ¶ 68.) Plaintiff alleges that by taking RM to the show without RM's assigned 1:1

professional, Bretagna was "unwittingly endangering the welfare of RM and trying to portray [Plaintiff's 1:1] paraprofessional duty as needless and redundant at JDHS." (Id. ¶ 70.)

On May 17, 2016, Bretagna gave Plaintiff two disciplinary letters. The first related to the February confrontation between Plaintiff and Cali. (Id. ¶ 71.) In this letter, Bretagna wrote that Plaintiff had violated Chancellor's Regulation A-421, which allegedly does not apply to incidents between staff members. (Id. ¶ 72.) The second letter related to the March 22, 2016, disciplinary meeting, and contained many factual errors. (Id. ¶ 75.) Plaintiff asked Solo to file grievances about each of these letters, but Solo did not do so. (Id. ¶¶ 73, 76.)

On or about June 13, 2016, Plaintiff filed a letter of rebuttal to Bretagna's first disciplinary letter. (Id. ¶ 74.) The next day, Hamilton invited Plaintiff and her union representative to a "due consideration meeting." (Id. ¶ 77.) Plaintiff alleges that the meeting was in fact a disciplinary meeting. (Id.) On June 27, 2016, Bretagna essentially reissued her first disciplinary letter and punished Plaintiff with a one-week suspension without pay, effective September 7 through September 14, 2016. (Id. ¶ 78.) Bretagna later modified the suspension so that it would begin on September 6, 2016. (Id. ¶ 79.)

According to Plaintiff, the DOE's practice is to withhold pay only if the employee agrees to it or if doing so is recommended at an administrative hearing, based upon supporting findings of fact. (Id. ¶ 80.) Messinger falsely told the payroll department that Plaintiff had agreed to have her pay withheld, when in fact Plaintiff did not do so.[4] (Id. ¶ 83.) The DOE also revoked Plaintiff's health coverage for an unspecified period of time as of September 8, 2016, upon

---

[4] The amended complaint is unclear with regard to whether Plaintiff's pay was actually withheld. (Compare id. ¶¶ 80, 84, with id. ¶ 81.) Nevertheless, because on a motion to dismiss the court must draw all reasonable inferences in the Plaintiff's favor, see Littlejohn v. City of New York, 795 F.3d 297, 306 (2d Cir. 2015), the court will assume that Plaintiff's pay was in fact withheld.

Hamilton's recommendation, causing Plaintiff to be personally liable for undisclosed medical bills.[5] (Id. ¶¶ 85-86, 88-90.)

## B. Procedural History

Plaintiff filed her complaint against the Municipal Defendants and Solo on October 3, 2016. (Compl. (Dkt. 1).) Plaintiff filed an amended complaint on March 27, 2017. (Am. Compl.) In her amended complaint, Plaintiff asserts six causes of action:

1. A First Amendment retaliation claim arising from the Municipal Defendants' actions following Plaintiff's statements about the impropriety of denying special-education students the rights granted them by their IEP;

2. A race-discrimination claim against the Municipal Defendants arising from Bretagna's promotion of Ashley at the expense of similarly situated minority paraprofessionals like Plaintiff;

3. A retaliation claim arising from the Municipal Defendants' actions after Plaintiff's protest of the manner in which Bretagna handled the excessing of minority paraprofessionals.

4. A retaliation claim arising from the Municipal Defendants' actions after Plaintiff's complaints to the DOE.

5. A claim against Solo for aiding and abetting race discrimination and retaliation by failing to take steps to help resolve Plaintiff's issues with Bretagna and the DOE; and

6. A claim against Messinger for aiding and abetting race discrimination and retaliation by falsely advising the Payroll and Human Resources department(s) that Plaintiff had agreed to accept the withholding of her pay for a weeklong period.[6]

---

[5] The amended complaint does not indicate for how long Plaintiff's health coverage was revoked or if it was ever reinstated.

[6] At one point in the amended complaint, Plaintiff alleges that her suspension without pay took place in 2016, (Am. Compl. ¶ 79); at another point, she alleges that it took place in 2014, (Am. Compl. ¶ 119). The surrounding context for the suspension, however, suggests that it could have only happened in 2016. For example, the suspension was allegedly imposed in a letter dated June 27, 2016, so it could not have occurred in 2014. Accordingly, for the purposes of deciding this motion, the court will treat the suspension as having taken place in 2016.

(Id. ¶¶ 91-121.)  The amended complaint does not identify the legal basis for each claim, but instead states that the action generally "arises under 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1983, First Amendment to the United States Constitution, and New York City Human Rights Law ("NYCHRL"), §8-107 et seq."  (Am. Compl. ¶ 1.)

On April 28, 2017, the Municipal Defendants submitted a motion to dismiss all claims against them for failure to state a claim upon which relief could be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Mun. Defs. MTD at 1.)  That same day, Solo filed a motion to dismiss the claims against him for lack of subject matter jurisdiction under Rule 12(b)(1), insufficient service of process under Rule 12(b)(5), and failure to state a claim upon which relief could be granted under Rule 12(b)(6).  (Solo MTD at 1.)  The court first addresses the Municipal Defendants' motion.

## II.    LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal adequacy of a plaintiff's complaint.  To survive a Rule 12(b)(6) motion, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In considering the sufficiency of the amended complaint, the court "accept[s] all [well-pleaded] factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor," Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002), but need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," Iqbal, 556 U.S. at 678.

## III.   DISCUSSION

Plaintiff has not indicated which of her six causes of action arise under §§ 1981 or 1983 as compared to the NYCHRL.  The court construes her claim for discrimination and two of her retaliation claims as arising under both federal law and the NYCHRL; her First Amendment violation as arising under only federal law because the NYCHRL does not provide a cause of action for First Amendment violations, see N.Y.C. Admin. Code § 8-101 et seq.; and her aiding-and-abetting claims as arising under only the NYCHRL because it is not clear that §§ 1981 and 1983 provide a remedy for aiding and abetting, Raghavendra v. NLRB, No. 08-CV-8120 (PAC) (HBP), 2009 WL 5908013, at *17-22 (S.D.N.Y. August 27, 2009) (report and recommendation) (holding that § 1981 does not provide such a remedy); see also Cent. Bank of Denver, N.A. v. First Interstate Bank, N.A., 511 U.S. 164, 177 (1994) (reasoning that "[if] Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text"), superseded in part by statute, 15 U.S.C. § 78t(f).

The defendants have moved to dismiss all claims on several grounds, including that Plaintiff did not plead facts that could establish any of her causes of action and that all defendants except Bretagna cannot be held liable for the alleged misconduct.  The court first addresses the former group of arguments.

### A.   Plaintiff's Causes of Action

#### 1.   First Cause of Action—First Amendment Violation

Plaintiff alleges that the DOE, Bretagna, and Hamilton violated her First Amendment rights (for which § 1983 provides a right of action) by retaliating against her with "adverse employment actions" after she complained about Bretagna's new policy of excessing and reassigning paraprofessionals who were previously assigned 1:1 to special-education students.

(See Am. Compl. ¶¶ 20-24, 48, 92-97.) To state a claim upon which relief can be granted, Plaintiff "must plausibly allege that (1) [her] speech or conduct was protected by the First Amendment; (2) the defendant[s] took an adverse action against [her]; and (3) there was a causal connection between this adverse action and the protected speech." Montero v. City of Yonkers, 890 F.3d 386, 394 (2d Cir. 2018) (quoting Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011)).

For the following reasons, and despite the Municipal Defendants' arguments to the contrary (see Mun. Defs. Mem. in Support of Mot. to Dismiss ("Mun. Defs. Mem.") (Dkt. 39) at 7-13), the court holds that the facts alleged in the amended complaint do satisfy the elements of a First Amendment violation, and accordingly denies the Municipal Defendants' motion to dismiss Plaintiff's first cause of action.

> a.    *Protected Speech*

For a public employee's speech to be protected by the First Amendment, the employee must be speaking as a citizen on a matter of public concern, rather than speaking pursuant to her official duties. Garcetti v. Ceballos, 547 U.S. 410, 418-20 (2006). If the employee "either did not speak as a citizen or did not speak on a matter of public concern," the speech is not protected. Sousa v. Roque, 578 F.3d 164, 170 (2d Cir. 2009). The court addresses these two issues in turn.

> i.    Whether Plaintiff Spoke as a Citizen

The Second Circuit has identified "two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether 'the speech fall[s] outside of the employee's 'official responsibilities,'" and (2) whether 'a civilian analogue [(i.e., a form or channel of discourse available to non-employee citizens)] exist[s].'" Montero, 890 F.3d at 397 (first and third alterations in original) (quoting Matthews v. City of New York, 779 F.3d 167, 173 (2d Cir.

10

2015)).  While the second issue "may be of some help in determining whether one spoke as a citizen," it is not dispositive; the first inquiry is the critical one.  Id. at 397-98.  What matters is not whether the speech was related to the employee's official duties, but rather whether it was pursuant to her official duties; if it was, the employee was speaking as an employee, not a citizen.  Id. at 398.

Here, there are two statements at issue.  The first is Plaintiff's comment to Lynette, a paraprofessional union representative, in or shortly after September 2015, in which she expressed her view that the new policy at JDHS would "contravene the IEP of the special education students whose IEP required one-to-one paraprofessional supervision" and would "violate the educational and civil rights of such special education students."  (Am. Compl. ¶ 24).  The second is Plaintiff's remark to Bretagna on or about February 2, 2016, after Bretagna had removed Plaintiff from assisting RM, in which Plaintiff reminded Bretagna that RM was entitled to 1:1 assistance and "made it clear to Bretagna[] that Bretagna had violated RM's rights and the terms of RM's IEP."  (Am. Compl. ¶¶ 44-45, 48.).

The Municipal Defendants contend that these statements are "clearly speech made as a DOE employee partly responsible for executing IEPs."  (Mun. Defs. Mem. at 7).  But as Plaintiff argues in her response memorandum, her job responsibilities did not include commenting on the school administration's violation of its special-education students' rights.  (Pl. Opp'n to Mun. Defs. Mot. (Dkt. 40) at 4).  Nor does it appear that her responsibilities included reporting her views on excessing or reassignment to union representatives like Lynette or assistant principals like Bretagna.  (Id.)  The amended complaint does not indicate, and the Municipal Defendants do not allege, that Plaintiff had any role in setting policy regarding the excessing or reassignment of paraprofessionals, or any other policy.  It can be inferred that Plaintiff was "neither expected to

speak on policy nor consulted on formulating policy." Matthews, 779 F.3d at 174. Accordingly, Plaintiff's speech was related, but not pursuant, to her duties as a paraprofessional at JDHS, and thus fell outside of Plaintiff's "official responsibilities." See id. (holding that a police officer had spoken as a citizen when he criticized an arrest-quota policy to his commanders because it was adversely affecting community relations).

Applying the second part of the Second Circuit's test—i.e., determining whether there is a civilian analogue for Plaintiff's speech—is more difficult here. Speech has a "'relevant civilian analogue' if it is made through 'channels available to citizens generally.'" Id. (quoting Jackler v. Byrne, 658 F.3d 225, 238 (2d Cir. 2011)). Like the plaintiff in Matthews, id. at 175-176, Plaintiff aired grievances to associates informally rather than following internal grievance procedures, which generally do not have a civilian analogue, see Weintraub v. Bd. of Educ., 593 F.3d 196, 204 (2d Cir. 2010). But Plaintiff made her complaints to a union representative and an assistant principal, who might not have an "open door to community comments and complaints" like the precinct commanders that the plaintiff spoke to in Matthews, 779 F.3d at 176. Plaintiff has not shown that ordinary civilians are "regularly provided the opportunity to raise issues with" Lynette or Bretagna. Id. (finding it relevant to the civilian-analogue inquiry that the precinct commanders regularly heard civilian complaints and the plaintiff "pursued the same avenue to complain about a . . . policy as would a concerned civilian").

Thus, whether a civilian analogue to Plaintiff's speech exists is a close question. The presence or lack of a civilian analogue is not dispositive, however; the "'critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties.'" Montero, 890 F.3d at 397-98 (quoting Lane v. Franks, 134 S. Ct. 2369, 2379 (2014)). As

12

discussed above, Plaintiff's speech fell outside her official responsibilities. Thus, it was citizen speech.

ii.      Matter of Public Concern

If Plaintiff spoke as a citizen, "it does not necessarily follow that [her] speech was constitutionally protected." Montero, 890 F.3d at 399. "The successful plaintiff must also demonstrate that the speech at issue was on a matter of public concern." Id. (citing Garcetti, 547 U.S. at 418).

> Whether speech is on a matter of public concern is a question of law, and is to be answered by the court after examining the content, form, and context of a given statement, as revealed by the whole record. To constitute speech on a matter of public concern, an employee's expression must be fairly considered as relating to any matter of political, social, or other concern to the community. On the other hand, speech that principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances—even if touching on a matter of general importance—does not qualify for First Amendment protection.

Id. at 399-400 (alteration adopted) (internal citations and quotation omitted). "The speaker's motive is a factor to consider but is not dispositive in determining whether his or her speech addresses a matter of public concern." Golodner v. Berliner, 770 F.3d 196, 202 (2d Cir. 2014) (citation and internal quotation marks omitted).

On its face, speech about whether a school's policy violates the rights of special-education students certainly relates to a "matter of political, social, or other concern to the community." The Municipal Defendants insist, however, that Plaintiff was motivated to speak not by a concern for students' rights, but by a personal issue: fear that she might be excessed or reassigned. (Mun. Defs. Mem. at 7-9.) As evidence that Plaintiff was motivated solely by personal concerns, the Municipal Defendants point to Plaintiff's allegation that Bretagna took Plaintiff's assigned student to a Broadway show in April 2016. (Id. at 8.)

13

The Municipal Defendants' argument is unavailing because it is belied by the amended complaint. There is no indication that Plaintiff ever believed she was at risk of being excessed.[7] (See Am. Compl. ¶ 43). The amended complaint does indicate that Plaintiff was temporarily reassigned on or about February 2, 2016, and that this reassignment inspired her to protest to Bretagna, but as Plaintiff notes, the Municipal Defendants have not explained why reassignment would personally harm Plaintiff. (Pl. Opp'n to Mun. Defs. Mot. at 4-5.) If Plaintiff were primarily concerned with her own situation and not the well-being of RM, it is not clear why she would have complained about reassignment at all. Indeed, the amended complaint supports an inference that Plaintiff's comments to Bretagna were about the impact her reassignment would have on RM, not on the effect of the reassignment on Plaintiff. (Am. Compl. ¶¶ 44, 48.) In addition, Bretagna's alleged Broadway trip did not take place until April 2016, so it is not relevant in assessing the motive for Plaintiff's fall 2015 comments to Lynette or her February 2016 comments to Bretagna. Even if it were relevant, Plaintiff indicated in the amended complaint that the Broadway trip was cause for concern because it endangered the welfare of RM, and not simply because it may have affected Plaintiff's situation. (Am. Compl. ¶ 68.)

Even if the court were to conclude that Plaintiff's statements were partially motivated by her displeasure about how excessing and reassignment would affect her personally, this would not preclude a finding that the speech was on a matter of public concern. See Montero, 890 F.3d at 401 (holding that a public employee's remarks criticizing an individual with whom he had a personal feud can be a matter of public concern if the remarks were not "solely 'calculated to redress [her] personal grievances'" (quoting Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir.

---

[7] In her brief in opposition to the Municipal Defendants' motion, Plaintiff explains that her seniority rendered her safe from being excessed. (Pl. Opp'n to Mun. Defs. Mot. at 4.)

1999))); Golodner, 770 F.3d at 203 (stating that "an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large"); Dorcely v. Wyandanch Union Free Sch. Dist., 665 F. Supp. 2d 178, 206 (E.D.N.Y. 2009) ("The requirement is not that the plaintiff have absolutely no personal interest; rather, that personal interest may not be the overriding one."). Because Plaintiff's comments to Lynette and Bretagna are fairly considered as relating to any matter of political, social, or other concern to the community, and were not solely calculated to redress personal grievances, they qualify as statements on matters of public concern and are protected by the First Amendment. Montero, 890 F.3d at 400-01.

Next, the court considers whether Plaintiff properly alleged that the defendants took an adverse action against her.

### b.    Adverse Action

To state a First Amendment retaliation claim, Plaintiff must show that the defendants took an adverse employment action against her that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Wrobel v. Cty. of Erie, 692 F.3d 22, 31 (2d Cir. 2012) (quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006)). Such an adverse action may include "harsh measures, such as discharge, refusal to hire, refusal to promote, reduction in pay, and reprimand, as well as some lesser sanctions, such as failure to process a teacher's insurance form, demotion, reassignment to a place that aggravated physical disabilities, and express accusations of lying." Id. (quoting Zelnik, 464 F.3d at 225). "[A] critical mass of minor incidents may support a claim for retaliation." Id. at 31 n.2.

Plaintiff alleges that she suffered several adverse employment actions. Most notably: (1) Cali, a school aide, verbally abused Plaintiff because, "upon information and belief," Bretagna enlisted her to do so (Am. Compl. ¶¶ 49-52, 60); (2) Bretagna harassed Plaintiff by summoning

her to several disciplinary meetings, filing disciplinary letters about her, and subjecting her to increased scrutiny (id. ¶¶ 36, 53-54, 56, 65-67, 71, 75, 77, 78); (3) the DOE suspended Plaintiff for eight days without pay (id ¶¶ 78-79); and (4) the DOE revoked her health insurance (for an unspecified period) as of September 8, 2018 (id. ¶¶ 85-86, 88).

The Municipal Defendants concede, and the court agrees, that the suspension constitutes an adverse employment action. (Mun. Defs. Mem. at 10.) The DOE's revocation of health insurance also qualifies as an adverse employment action. Cf. Wrobel, 692 F.3d at 31 (stating that an employer's failure to process an employee's insurance form can be an adverse action). Furthermore, some of the alleged acts of retaliation, treated separately, might be trivial, but—drawing all reasonable inferences in Plaintiff's favor—they were part of a chain of events that led to Plaintiff's suspension. According to Plaintiff, "upon information and belief" Bretagna enlisted Cali to confront Plaintiff as retaliation for her speech, and then the DOE suspended Plaintiff without pay and revoked her health coverage as punishment for her confrontation with Cali. (Am. Compl. ¶ 60). When viewed as part of a pattern of retaliatory conduct that culminated in Plaintiff's suspension and loss of health insurance, these alleged incidents form a "critical mass [that] may support a claim for retaliation." Wrobel, 692 F.3d at 31 n.2; cf. Bernheim v. Litt, 79 F.3d 318, 326 (2d Cir. 1996) (stating that district courts should not "'prune' a complaint at the pleading stage by making a determination with regard to each allegation within a cause of action [for First Amendment retaliation] that is legally cognizable when viewed in its totality").

### c. *Causal Connection*

"To demonstrate a causal connection 'a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action.'" Smith v. Cty. of

16

Suffolk, 776 F.3d 114, 118 (2d Cir. 2015) (quoting Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 167 (2d Cir. 2006)). "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." Id. (citing Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004)). "Since a direct showing requires plaintiff to provide 'tangible proof' of retaliatory animus, 'conclusory assertions of retaliatory motive' are insufficient." Id. (citing Cobb, 363 F.3d at 108). With respect to an indirect showing, the Second Circuit "has not established a specific delay between protected activity and adverse employment action that defeats an inference of causation." Burkybile v. Bd. of Educ., 411 F.3d 306, 314 (2d Cir. 2005). In one case, a delay of three months was fatal to a showing of causation, see Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990); in another case, a delay of eight months supported a showing of causation, see Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980).

According to the Municipal Defendants, the more-than-four-month gap between Plaintiff's protected speech and the announcement of her suspension undermines her claim that her speech was a motivating factor in the suspension. (Mun. Defs. Mem. at 12-13.) Additionally, the Municipal Defendants argue that the only plausible cause of Plaintiff's suspension was her February 3, 2016, altercation with Cali, not any retaliatory animus. (Id.) Consistent with the Municipal Defendants' argument, the amended complaint itself alleges that the confrontation between Plaintiff and Cali was the purported reason for Plaintiff's suspension. (Am. Compl. ¶¶ 71-72.)

But the causation issue is not that simple. The amended complaint also alleges upon information and belief that Cali instigated the altercation at Bretagna's behest, and that Bretagna

used the altercation as a pretext for suspending Plaintiff. (Id. ¶¶ 60-61.) Essentially, Plaintiff has pleaded that her confrontation with Cali was orchestrated by Bretagna, who was "looking for ways to get rid of [Plaintiff] as a paraprofessional at JDHS" in retaliation for Plaintiff's protected speech. (Id. ¶ 61.) If Plaintiff is able to prove these accusations, she will have established a causal connection between the suspension and her protected speech. Thus, Plaintiff's claim that her speech was a "substantial motivating factor" in the suspension is not undermined by the temporal gap between Plaintiff's protected speech and the suspension, nor is it negated by Bretagna's citation of Plaintiff's averment that her fracas with Cali was the purported reason for Bretagna's decision to suspend her.

Plaintiff also alleges more facts that, if proven, could be considered circumstantial evidence for her causation theory: her altercation with Cali took place only about one day after Plaintiff had protested her reassignment to Bretagna (id. ¶¶ 44, 48-49); Bretagna never punished Cali even though Cali, not Plaintiff, caused the altercation (id. ¶ 58); she had no conflicts with Cali prior to their confrontation (id. ¶ 60); and the regulation that Bretagna accused Plaintiff of violating does not apply to incidents between staff members like Cali and Plaintiff (id. ¶ 72).[8] These accusations regarding the cause of Plaintiff's suspension are too specific to be considered "mere conclusory statements" or "legal conclusion[s] couched as [] factual allegation[s]," Iqbal, 556 U.S. at 678; accordingly, for the purposes of this motion to dismiss, the court must accept them as true. When taking these allegations into account, Plaintiff has alleged enough "by way

---

[8] Plaintiff pleaded some of these facts "upon information and belief." Doing so is permissible where the facts "are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (citations and quotation marks omitted); see also Boykin v. KeyCorp, 521 F.3d 202, 215 (2d Cir. 2008) (stating that, even after Twombly, 550 U.S. 544 (2007), the district court should not have faulted the plaintiff for pleading facts alleged "upon information and belief"). Here, information regarding whether Bretagna orchestrated Plaintiff's quarrel with Cali and whether it was merely a pretext for Plaintiff's suspension are peculiarly within the Municipal Defendants' possession, so the court treats those allegations as true for the purposes of this motion.

of factual content to nudge [her] claim" on the element of causation "across the line from conceivable to plausible." Id. at 680 (alteration adopted) (citation and internal quotation marks omitted).

For the foregoing reasons, the court finds that—drawing all reasonable inferences in favor of Plaintiff—she has plausibly pleaded enough facts to support her First Amendment retaliation claim.

### 2. Second Cause of Action—Racial Discrimination

For her second cause of action, Plaintiff alleges that the DOE racially discriminated against her by promoting Ashley and not giving similarly situated minority paraprofessionals like Plaintiff the opportunity to compete for the same promotion. (See Am. Compl. ¶¶ 99-102.) The court construes the amended complaint to raise both federal- and city-law claims.

### a. Federal-Law Discrimination Claim

To defeat a motion to dismiss, a plaintiff asserting a federal race discrimination claim[9] "must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision."[10] Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87 (2d Cir. 2015) A plaintiff may meet the second requirement "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." Id. The

---

[9] It is not clear whether Plaintiff is attempting to vindicate her rights under § 1981, the Equal Protection Clause of the Fourteenth Amendment of the Constitution (via § 1983), or both; however, this ambiguity does not affect the court's analysis. See Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010) ("The substantive standards applicable to claims of employment discrimination under Title VII, ... are also generally applicable to claims of employment discrimination brought under § 1981 [and] the Equal Protection Clause . . . .).

[10] In a Section 1983 case, a plaintiff must also show "that the adverse action was taken by someone acting under color of state law." Vega, 801 F.3d at 88 (quotation marks omitted). The Municipal Defendants do not contest this issue.

cannot assess the size of the alleged racial disparity.  C.f. Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 307-308 (1977) (stating that statistical evidence of "gross disparity" may constitute prima facie proof of discriminatory intent); Burgis, 798 F.3d at 69 (same); Ottaviani v. State Univ. of N.Y. at New Paltz, 875 F.2d 365, 371 (2d Cir. 1989) (same).  If she had pleaded, for example, that the DOE had excessed a large proportion of its minority employees, but a relatively small portion of its Caucasian employees, that might suffice to create an inference of discriminatory animus.  But she has not done so.

Additionally, Plaintiff has not provided enough context for her assertion that JDHS hired two Caucasian paraprofessionals in early 2017.  (Compl. ¶ 42.)  It is true that "an inference of discrimination . . . arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class."  Littlejohn v. City of New York, 795 F.3d 297, 312-13 (2d Cir. 2015).  But Plaintiff did not allege that the new paraprofessionals replaced the excessed employees.  She left open the possibilities that these new employees were hired in different roles and that JDHS simultaneously hired minority paraprofessionals; either of these possibilities, if true, would contradict the suggestion that the Caucasian paraprofessionals "replaced" the excessed employees.  C.f. id. (indicating that an inference of discrimination arises only when the terminated employee is replaced with someone outside the employee's protected class); de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996) (same).

For the foregoing reasons, Plaintiff failed to plead facts that give rise to a plausible inference of discrimination, so her federal racial-discrimination claims against all defendants are dismissed.[11]

---

[11] Other allegations in the amended complaint, if proven, could help create an inference of discrimination.  Specifically, Plaintiff avers that "[i]t was no secret that Bretagna wanted to eliminate many paraprofessionals from

22

court agrees with the Municipal Defendants that Plaintiff has not alleged sufficient facts to show, directly or indirectly, that race was a motivating factor in the DOE and Bretagna's decision to promote Ashley without giving similarly situated minority paraprofessionals like Plaintiff the same opportunity. (See Mun. Defs. Mem. at 15-19.)

In her attempt to plead an indirect showing of discrimination, Plaintiff makes three allegations: the DOE promoted Ashley at the expense of other employees that supposedly were similarly situated (Am. Compl. ¶ 101); Hamilton announced that "she wanted to return JDHS to what it was" (Am. Compl. ¶ 31); and the DOE excessed minority paraprofessionals in early 2016 and then hired two white paraprofessionals about a year later (Am. Compl. ¶¶ 41-42). None of these allegations plausibly create an inference of discriminatory intent.

An employer's preferential treatment toward a similarly situated employee outside of a plaintiff's protected class can raise an inference of discrimination. See Ruiz v. County of Rockland, 609 F.3d 486, 493 (2d Cir. 2010). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." Id. at 493-94 (citation and internal quotation marks omitted). But Plaintiff has not successfully alleged that she and Ashley were similarly situated. She pleaded only one commonality between Ashley and herself: they were both paraprofessionals. (See Compl. ¶ 101; Pl. Opp'n to Mun. Defs. Mot. at 7.) She did not plead that they were subject to the same evaluation and discipline standards or that they engaged in comparable conduct. See Ruiz, 609 F.3d at 493. Thus, the bare allegation that Ashley was promoted in lieu of similarly situated employees does not create an inference of discriminatory intent. On the contrary, from all that one can tell from the amended complaint, it is equally possible that Plaintiff was not promoted for "valid, non-discriminatory reasons." See Burgis v.

N.Y.C. Dep't of Sanitation, 798 F.3d 63, 68 (2d Cir. 2015). For example, as the Municipal

Defendants point out, Plaintiff left open the possibilities that Ashley was promoted because she

was more qualified or had an especially good relationship with Bretagna. (See Mun. Defs. Mem.

at 17-19.) Indeed, the amended complaint states that Bretagna and Ashley had a pre-existing

relationship (Am. Compl. ¶ 28), which may explain Ashley's promotion. See Yusuf v. Vassar

College, 35 F.3d 709, 714 (2d Cir. 1994) (a friendship between fellow members of a college

regulations panel and the prevailing party weakened any inference that racial discrimination

played a role in the panel's decision).

Similarly, Hamilton's alleged statement that she wanted to "return JDHS to what it was"

is far too ambiguous to suggest discriminatory motivation. As the Municipal Defendants argue,

this statement could have any number of meanings. (Mun. Defs. Mem. at 18-19.) Without

further context, that allegation does not come close to satisfying Plaintiff's burden. See Toney v.

Prob. Dep't, No. 15-CV-0561 (JS) (GRB), 2016 WL 859381, at *6 (E.D.N.Y. Jan. 28, 2016);

Ford v. N.Y.C. Dep't of Health & Mental Hygiene, 545 F. Supp. 2d 377, 389 (S.D.N.Y. 2008).

Plaintiff's allegations that the DOE excessed minority paraprofessionals and hired two

Caucasian ones a year later also do not create an inference of discriminatory intent. Hiring

statistics alone may be sufficient to warrant a plausible inference of discriminatory intent if they

are "of a level that makes other plausible non-discriminatory explanations very unlikely."

Burgis, 798 F.3d at 69. Plaintiff's bare assertion that the excessed employees were

"overwhelmingly minorities" is too imprecise to imply discriminatory intent. (Am. Compl.

¶ 41.) She does not provide any actual statistics; for example, she does not indicate how many

employees were excessed, what proportion of JDHS paraprofessionals were minorities, or what

proportion of the minority paraprofessionals were excessed. Without these statistics, the court

b.      *NYCHRL Claim*

Plaintiff relies on the same factual allegations discussed above in support of her

NYCHRL discrimination claim. As the Municipal Defendants acknowledge, because NYCHRL

discrimination claims are scrutinized under a more lenient standard than federal-law

discrimination claims, the court must analyze Plaintiff's NYCHRL discrimination claim

separately. (Mun. Defs. Mem. at 19.); see Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,

715 F.3d 102, 109 (2d Cir. 2013). "To state a claim for discrimination under the NYCHRL, a

plaintiff must only show differential treatment of any degree based on a discriminatory motive."

Gorokhovsky v. N.Y.C. Hous. Auth., 552 F. App'x 100, 102 (2d Cir. 2014) (summary order).

The court agrees with the Municipal Defendants that, even under the NYCHRL's more

liberal standard, Plaintiff's claim fails because she has not plausibly alleged that that her race

played any role in JDHS's failure to allow her to compete for a promotion. (See Mun. Defs.

Mem. at 19.) JDHS's promotion of Ashley, who is outside of Plaintiff's protected class, does not

support an inference of causation because, as discussed above, Plaintiff has not shown that she

and Ashley are similarly situated and has not ruled out other valid, non-discriminatory

explanations for Ashley's promotion. Hamilton's statement that she "wanted to return JDHS to

what it was," and JDHS's hiring of two Caucasian paraprofessionals in early 2017, do not show a

discriminatory motive either. Plaintiff has failed to establish a causal connection between her

race and any alleged native treatment, so her NYCHRL claim must be dismissed. See Johnson v.

Andy Frain Servs., Inc., 638 F. App'x 68, 71 (2d Cir. 2016) (summary order).

---

JDHS, or cut down on the benefits of the African American one-to-one special education students" (Am. Compl. ¶ 30), and "Butts understood . . . that Hamilton wanted JDHS to be a predominantly white school as it was in the 90s and before" (id. ¶ 31)). But the court need not consider such conclusory allegations. See Iqbal, 556 U.S. at 678.

3.  <u>Third and Fourth Causes of Action—Retaliation for Opposing</u>
    <u>Discrimination</u>

Separately from her First Amendment retaliation claim, Plaintiff brings two causes of

action for retaliation arising from her opposition to alleged discrimination. (Am. Compl. ¶¶ 103-

09.) One arises from the Municipal Defendants' response to Plaintiff's protest of JDHS's

excessing minority paraprofessionals. (<u>Id.</u> ¶¶ 104-05.) The other arises from the Municipal

Defendants' reactions to Plaintiff's complaints to the DOE. (<u>Id.</u> ¶¶ 107-08.) With respect to

both claims, Plaintiff contends that the Municipal Defendants retaliated by reassigning her,

supervising her with greater scrutiny, and finally suspending her without pay or health coverage.

(<u>Id.</u> ¶¶ 105, 108.) The court construes the amended complaint to raise both federal- and city-law

retaliation claims.

### a.    *Federal-Law Retaliation Claims*

Sections 1981 and 1983 encompass claims against employers or supervisors who retaliate

against an employee for opposing discrimination in the terms of her employment.[12] <u>CBOCS W.,</u>

<u>Inc. v. Humphries</u>, 553 U.S. 442, 446 (2008) (§ 1981); <u>Vega</u>, 801 F.3d at 80 (§ 1983). For this

type of retaliation claim to survive a motion to dismiss, a plaintiff must plausibly allege that the

defendants took adverse employment action against her because she complained of or otherwise

opposed discrimination.[13] <u>Vega</u>, 801 F.3d at 91. A plaintiff need not demonstrate a connection

between the alleged retaliatory acts and her race or ethnicity. <u>Id.</u>

---

[12] The court assumes that Plaintiff did not intend the third and fourth cause of action to be for First Amendment retaliation, since Plaintiff clearly stated that her first cause of action was for First Amendment retaliation but did not do so in her third and fourth causes of action.

[13] In a § 1983 case, a plaintiff must also show "that defendants acted under the color of state law." <u>Vega</u>, 801 F.3d at 88 (quotation marks omitted). The Municipal Defendants do not contest this issue.

An adverse action, like in the First Amendment context, is any act that could dissuade a reasonable person from making a charge of discrimination. Id. at 90. However, unlike in the First Amendment context, to establish causation a plaintiff must plausibly allege that she would not have been subjected to the adverse action but for retaliatory animus. Id. at 90-91. Simply alleging that retaliation was a "substantial or motivating factor" for the adverse action is insufficient. Id. (quotation marks omitted). Nevertheless, a plaintiff can still show causation through temporal proximity. Id. at 91.

The Municipal Defendants concede that Plaintiff was engaged in protected activity and that suspension without pay can constitute adverse action. (Mun. Defs. Mem. at 13.) They argue, however, that Plaintiff's altercation with Cali was a more likely cause for her suspension than retaliatory animus, and thus Plaintiff failed to meet the causation standard. (Id. at 13-14.) In other words, the Municipal Defendants argue that it is not plausible to infer that Bretagna would not have suspended Plaintiff absent retaliatory motive.[14] (Id.)

The court finds, however, that Plaintiff's allegations "establish a drumbeat of retaliatory animus from which a plausible inference of causation can be drawn." Duplan v. City of New York, 888 F.3d 612, 626 (2d Cir. 2018). Plaintiff alleges that, in the time that passed between her protected activity and the suspension, she was reassigned, increasingly scrutinized and harassed, subjected to more requirements than her colleagues, and the defendants took action intended to undermine her value as a paraprofessional. (Am Compl. ¶¶ 44, 61-63, 70.) Where an adverse action occurs "against a backdrop of continuing antagonism," the court will find but-

---

[14] The Municipal Defendants go on to argue that "the Amended Complaint itself establishes that the suspension would not have occurred but-for the verbal altercation with Ms. Cali." (Mun. Defs. Mem. at 14.) However, this is the wrong standard since but-for causation does not require retaliation to be the sole cause of the adverse action. Vega, 801 F.3d at 91.

for causation even if there might be another motivating factor. See Duplan, 888 F.3d at 626 (finding but-for causation despite a co-worker's accusations of sexual harassment against the plaintiff occurring during the three-year gap between the protected activity and the suspension). Additionally, Plaintiff alleged that Cali was not even subjected to a disciplinary hearing after their altercation (Am. Compl. ¶ 58), furthering the inference that Plaintiff would not have been suspended but-for retaliatory motive. And, as discussed above, Plaintiff pleaded enough to support an inference that Bretagna used Plaintiff's fracas with Cali as a pretext to suspend her.

In sum, for essentially the same reasons that the court does not dismiss Plaintiff's First Amendment retaliation claim, the court also does not dismiss Plaintiff's other federal retaliation claims. She has pleaded sufficient facts to support an inference that adverse action was taken against her because she engaged in protected activity.

b. *NYCHRL Retaliation Claims*

To prevail on an NYCHRL retaliation claim, a plaintiff "must show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Mihalik, 715 F.3d at 112 (internal citations omitted). This is a more lenient version of the standard for § 1981 and § 1983 retaliation claims. See id. at 109 (indicating that the NYCHRL provisions are broader and more plaintiff-friendly than the equivalent federal standards).

Because Plaintiff has stated a plausible retaliation claim under §§ 1981 and 1983, her parallel NYCHRL claim also stands. See Wynn v. N.Y.C. Hous. Auth., No. 14-CV-2818 (SAS), 2015 WL 4578684, at *5 (S.D.N.Y. July 29, 2015) (citing Mihalik, 715 F.3d at 109).

Just as Plaintiff has met the pleading standard for her federal retaliation claims, she also meets the more lenient standard applicable to her NYCHRL retaliation claims. It is reasonable to

infer that she was opposing discrimination when she protested the excessing of minority paraprofessionals and complained to the DOE, and that there was a causal connection between her statements and her suspension without pay (a punishment that is likely to deter a person from opposing discrimination).

At this point in the court's analysis, Plaintiff's discrimination claims have been dismissed, but she has stated a claim for retaliation against the Municipal Defendants under the First Amendment, §§ 1981 and 1983, and the NYCHRL. The court now addresses the parties' arguments about whether particular defendants may be held liable for any of Plaintiff's claims, including Plaintiff's aiding-and-abetting claims against Messinger and Solo.

### B.    Liability of Particular Defendants

####     1.    The DOE

The Municipal Defendants contend that all of Plaintiff's federal-law claims against DOE should be dismissed because Plaintiff failed to plead that any constitutional violations she suffered were the result of municipal customs and procedures, such that the DOE is liable under Monell v. Department of Social Services, 436 U.S. 658 (1978). (Mun. Defs. Mem. at 24.) Plaintiff concedes this point. (See Pl. Opp'n to Mun. Defs. Mot. (Dkt. 40) at 2.)

The court agrees with the parties on this issue. Plaintiff failed to plead a Monell policy; thus, her federal-law claims against the DOE must be dismissed. See Monell, 436 U.S. at 692-94; see also Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004) (indicating that the Monell requirement applies to both §§ 1981 and 1983 claims).

Additionally, the Municipal Defendants argued that all of Plaintiff's NYCHRL claims against the DOE should be dismissed because Plaintiff failed to file a notice of claim within three months of the incident allegedly causing harm and subsequently plead such compliance, as she

was required to do under Section 3813(1) of the New York Education Law. Plaintiff does not dispute the Municipal Defendants' contention that Plaintiff failed to file a notice of claim. (C.f. Pl. Opp'n to Mun. Defs. Mot. at 7-8 (arguing that there is no requirement for a notice of claim to be served against individual defendants, but not arguing that such a requirement exists for the DOE).

The Municipal Defendants are correct on this point as well. Absent the required notice, no action may be maintained against the DOE. See United States v. N.Y.C. Dep't of Educ., No. 16-CV-4291 (LAK) (JCF), 2017 WL 435940, at *6 (S.D.N.Y. Jan. 31, 2017), report and recommendation adopted, 2017 W: 1319695 (S.D.N.Y. Apr. 4, 2017); Smith v. N.Y.C. Dep't of Educ., 808 F. Supp. 2d 569, 578 (S.D.N.Y. 2011). Plaintiff did not plead that she filed notice. Thus, the court dismisses all NYCHRL claims against the DOE. No claims against the DOE remain.

### 2. Messinger and Hamilton

The Municipal Defendants argue that all claims brought against Messinger and Hamilton should be dismissed because Plaintiff did not sufficiently allege their personal involvement in the alleged deprivation of her rights, nor did she allege that Messinger and Hamilton were motivated by discriminatory or retaliatory animus. (Mun. Defs. Mem. at 22-24.) Plaintiff's only counter-arguments are that the Municipal Defendants failed to carry their burden on this issue and that they speculated and cited inapposite case law. (Pl. Opp'n to Mun. Defs. Mot. at 8.)

The court agrees with the Municipal Defendants that Plaintiff has failed to state claims for relief against Messinger and Hamilton. The "Relevant Facts" section of the amended complaint includes but one mention of Messinger: an allegation that "Messinger . . . falsely advised Payroll and Human Resources that [Plaintiff] had agreed to a loss of pay as a way to

resolve this disciplinary matter." (Am. Compl. ¶ 83.) Each of Plaintiff's retaliation claims against Messinger requires her to allege facts that would show retaliatory intent on Messinger's part, and Plaintiff has not done so. See CBOCS W., 553 U.S. at 446 (indicating that, for a § 1981 retaliation claim, a plaintiff must show retaliatory animus); Vega, 801 F.3d at 80 (same for a § 1983 retaliation claim); Smith, 776 F.3d at 118 (same for a First Amendment retaliation claim); Mihalik, 715 F.3d at 112 (same for a NYCHRL claim). In fact, Plaintiff has not even alleged that Messinger knew about her statements that allegedly caused Bretagna to retaliate against her. Thus, the court dismisses Plaintiff's retaliation claims against Messinger.

Similarly, Plaintiff's aiding-and-abetting claim against Messinger require her to plead that Messinger knew the wrongful nature of the primary tortfeasor's conduct. See Bigio v. Coca-Cola Co., 675 F.3d 163, 172 (2d Cir. 2012) (indicating that, to state an aiding-and-abetting claim under New York law, a plaintiff must allege the defendant's knowledge of the underlying tort); Pittman ex rel. Pittman v. Grayson, 149 F.3d 111, 123 (2d Cir. 1998) (same); Morgan v. NYS Att'y Gen.'s Office, No. 11-CV-9389 (PKC) (JLC), 2013 WL 491525 at *13 (S.D.N.Y. Feb. 8, 2013) (stating that aider-and-abettor liability may extend to officials who fail to "take appropriate remedial measures despite being informed about the existence of alleged discriminatory conduct"). Plaintiff failed to do this. She did not allege that Messinger even knew about the other defendants' conduct, let alone that Messinger had knowledge of the wrongful nature of such conduct. So the court dismisses Plaintiff's aiding-and-abetting claim against Messinger as well.

Like Messinger, Hamilton is a bit player in the events described in the amended complaint. She is mentioned in only three paragraphs of the "Relevant Facts" section. (Am. Compl. ¶¶ 31, 77, 86.) In one of these paragraphs, Plaintiff alleges that Hamilton announced at a

JDHS faculty meeting that she "wanted to return JDHS to what it was," which Plaintiff understood to mean that Hamilton wanted JDHS to be predominantly Caucasian. (Id. ¶ 31.) As discussed above, Hamilton's statement is far too ambiguous to suggest discriminatory motivation.

Plaintiff's other allegations regarding Hamilton are that she invited Plaintiff and her union representative to a disciplinary meeting in June 2016[15] (Am. Compl. ¶ 77) and that she advised the DOE that Plaintiff's health coverage should be terminated (id. ¶ 86). As the Municipal Defendants point out, nothing in the amended complaint suggests that Hamilton acted with illegal intent or even with knowledge of Plaintiff's protests regarding the excessing policy. (Mun. Defs. Mem. at 24.) Just as with Messinger, Plaintiff's retaliation claims against Hamilton require her to prove wrongful intent. Because Plaintiff cannot do this, her retaliation claims against Hamilton must be dismissed.

No claims against Messinger or Hamilton remain.

### 3.    Solo

Plaintiff brings a NYCHRL claim against Solo for aiding and abetting race discrimination and retaliation. The gravamen of this claim is that Solo allegedly failed to take steps to help Plaintiff resolve her issues with the DOE, despite being aware that Bretagna's treatment of Plaintiff was motivated by discriminatory and retaliatory animus. (Am. Compl. ¶¶ 110-117.) Solo has moved to dismiss the claim against him on three grounds: (1) despite how it is styled, Plaintiff's claim is in essence a claim for breach of Solo's duty of fair representation, which the court lacks jurisdiction over; (2) Plaintiff failed to state a claim for relief because her allegations

---

[15] The amended complaint does not indicate whether this meeting ever took place.

were legally insufficient, and (3) insufficient service of process was made on Solo. (Solo Mem. (Dkt. 31) at 2.)

Solo's jurisdictional argument is unpersuasive. He cites cases holding that federal courts do not have subject-matter jurisdiction over a certain type of duty of fair representation claim, but Plaintiff did not bring such a claim against Solo; she brought an NYCHRL aiding-and-abetting claim. While it is true that § 1981 employment discrimination claims against labor unions are rooted in the union's duty of fair representation to its members, federal courts still exercise jurisdiction over such claims. Hill v. City of New York, 136 F. Supp. 3d 304, 339-41 (E.D.N.Y. 2015); Klaper v. Cypress Hills Cemetery, No. 10-CV-1811 (NGG), 2012 WL 959403, at *7-8 (E.D.N.Y. Mar. 21, 2012). Solo does not explain why, or cite any authority indicating, that a federal court should treat a claim styled as arising under the NYCHRL as a duty of fair representation claim over which the court lacks jurisdiction. (See Solo Mem. at 14-17.) Thus, the court rejects Solo's jurisdictional argument and addresses the merits of Plaintiff's claim.

"[U]nder New York law, a plaintiff generally states a claim for aiding and abetting upon alleging facts sufficient to support an inference of (1) the existence of an underlying tort; (2) the defendant's knowledge of the underlying tort; and (3) that the defendant provided substantial assistance to advance the underlying tort's commission." Bigio, 675 F.3d at 172 (alterations adopted); see also Feingold v. New York, 366 F.3d 138, 158 (2d Cir. 2004) (applying the New York state-law standard for aiding-and-abetting liability to an NYCHRL claim). For NYCHRL aiding-and-abetting claims, a plaintiff must show that the defendant "actually participate[d] in the conduct giving rise to [the underlying claim]." Feingold, 366 F.3d at 157-58.

As discussed above, Plaintiff fails to state an NYCHRL claim for discrimination against any defendant. Because Plaintiff has not established an underlying violation of any anti-

discrimination law, her claim against Solo for aiding and abetting discrimination fails. See

Aiossa v. Bank of Am., N.A., No. 10-CV-1275 (JS), 2012 WL 4344183, at *5 (S.D.N.Y. Sept.

21, 2012).

Plaintiff also claims that Solo aided and abetted retaliation. The retaliatory act at issue is

Bretagna's suspension of Plaintiff. Allegedly, Solo contributed to the suspension by failing to

file a grievance about a disciplinary letter that Plaintiff received from Bretagna in May 2016

regarding her confrontation with Cali. (Am. Compl. ¶ 71, 73.) Over a month later, Bretagna

reissued that letter and suspended Plaintiff without pay for the Cali incident. (Id. ¶ 78.) The

implication seems to be that, had Solo grieved the May 2016 letter, he could have prevented the

suspension. Afterward, Solo did not try to help Plaintiff grieve her suspension (id. ¶ 115)—

although, as Solo points out, Plaintiff has not indicated that she ever informed Solo of her

suspension. (Solo Mem. at 13.) Plaintiff asserts without elaboration that Solo was "fully aware"

of Plaintiff's comments opposing discrimination (Am. Compl. ¶ 114) and "knew that there was a

racial component" to the way Bretagna treated Plaintiff (id. ¶ 115).

While Plaintiff's claim against Solo comes closer to meeting the Twombly/Iqbal

threshold than her claim against Messinger, it nonetheless falls short because Plaintiff's

pleadings do not satisfy the second or third prongs of an aiding-and-abetting claim. See Bigio,

675 F.3d at 172. She does not meet the second prong because she has not pleaded any plausible

facts that would show that Solo knew that Bretagna's actions were motivated by retaliatory

animus. Indeed, she has not even pleaded that she told Solo about her suspension, or that Solo

had reason to suspect that Bretagna orchestrated Plaintiff's altercation with Cali or used it as a

pretext to punish her. Plaintiff's statements that Solo was "fully aware" of her comments

opposing discrimination and "knew that there was a racial component" to Bretagna's retaliatory

conduct are too conclusory to show that Solo "knew the wrongful nature of" Bretagna's conduct. Pittman ex rel. Pittman, 149 F.3d at 122-23.

Plaintiff does not meet the third prong either because she failed to allege facts that would show that Solo "provided substantial assistance to advance the underlying tort's commission." Bigio, 675 F.3d at 172. Even taking Plaintiff's allegations as true, Solo's failure to file a grievance about a disciplinary letter before Plaintiff was actually suspended does not qualify as "actual[] participat[ion]," Feingold, 366 F.3d at 158, in Bretagna's suspension of Plaintiff. NYCHRL aiding-and-abetting liability in the employment context is typically reserved for individuals whose employers or coworkers were the primary offenders. See, e.g., id. (holding that employees could be held liable for aiding and abetting their employers or supervisors); Torres v. N.Y. Methodist Hosp., No. 15-CV-1264 (PKC), 2016 WL 3561705 at *12-14 (E.D.N.Y. Jan. 7, 2016) (discussing at length aiding-and-abetting liability for individuals whose employers or coworkers are directly liable, and never suggesting that aiding-and-abetting liability might apply to individuals who are disconnected to the primary offender). The court is not aware of any case law suggesting that, absent discriminatory or retaliatory animus, a union representative can be considered an aider-and-abettor for failing to take proactive steps (e.g., filing a grievance) to prevent a potential adverse employment action.

Accordingly, the court dismisses Plaintiff's claims against Solo without prejudice.[16]

### 4.    Bretagna

The Municipal Defendants have not argued that Bretagna in particular may not be held liable for any of the claims against her, and the court has already rejected their arguments for

---

[16] Because the court grants Solo's motion to dismiss on other grounds, it need not address his argument that he did not receive proper service.

why Plaintiff's retaliation claims should be dismissed in general. Accordingly, Plaintiff's retaliation claims against Bretagna remain intact.

## IV.     CONCLUSION

Solo's motion to dismiss (Dkt. 29) is GRANTED. The court DISMISSES all of Plaintiff's claims against Solo without prejudice.

The Municipal Defendants' motion to dismiss (Dkt. 37) is GRANTED IN PART and DENIED IN PART. The court DISMISSES, without prejudice, all of Plaintiff's claims against the DOE, Messinger, and Hamilton, as well as Plaintiff's race-discrimination claims against Bretagna. The Municipal Defendants' motion is denied with respect to the following claims: (1) the First Amendment claim against Bretagna; (2) the § 1981, § 1983, and NYCHRL retaliation claims against Bretagna arising from her actions after Plaintiff's comments about excessing; and (3) the § 1981, § 1983, and NYCHRL retaliation claims against Bretagna arising from her actions after Plaintiff's complaints to the DOE.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       September 28, 2018

NICHOLAS G. GARAUFIS
United States District Judge